[Crim. No. 7155.   Second Dist., Div. One.   Dec. 23, 1960.]

THE PEOPLE, Respondent, v. JOSEPH NICHOLAS CRISAFI, Appellant.

Frank Duncan and Elinor Chandler Katz for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Robert M. Sweet, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal from a judgment of conviction and the denial of a motion for a new trial in a proceeding wherein the defendant was found guilty of rape and kidnapping.

In an information filed in Los Angeles County it was charged that appellant, on or about July 26, 1959, violated the provisions of Penal Code, section 261, subdivision 3 (rape) and the provisions of Penal Code, section 207 (kidnapping). It was also charged that appellant had suffered a previous conviction of a felony in California in 1958 and served a term therefor. Appellant admitted the prior conviction and pleaded not guilty to the rape and kidnapping charges. A jury, after a trial, found appellant guilty on both counts. A motion for a new trial was denied. Probation was denied and appellant was sentenced. The appeal is from the judgment and the order denying the motion for a new trial.

A résumé of the facts is as follows:

A 23-year-old married lady, hereinafter referred to as the victim, resided in Seal Beach and was employed by a physician and surgeon in Long Beach. At about 8 p.m. Saturday, July 25, 1959, she drove from her home to Wilmington to visit some

friends. The victim left her friends' house at about 11:30 p.m. and started to drive home. She stopped at a bar named "The Nineteenth Hole" which was located on Anaheim Street in Long Beach. As she left the bar at about 1:40 a.m., July 26, 1959, she walked toward her car which was parked at the curb nearby. As she did so a car, driven by the appellant, pulled up and stopped. He asked the victim if a lady named Judy was in the bar and the victim, after asking some questions about whether the person referred to as Judy would have been alone, answered the appellant to the effect that such a person was not in the bar. Appellant then asked the victim if she would take $75 to come with him. The victim, after refusing any offers of appellant, walked to her car, got into the driver's seat, and had the keys to the car in her hand preparatory to starting the motor when the appellant pulled his car in front of the victim's car, got out of his car and came to the driver's side of the victim's car. Appellant then said to the victim that if she "wouldn't take the $75, then how much would" it be "for a kiss." Appellant was told by the victim to leave her alone, whereupon he reached through the open window and grabbed the victim's car ignition keys, put his arm around the victim and kissed her. The victim attempted to pull away and appellant slapped her and told her to settle down and not to fight him. Appellant then told the victim to come with him or he would kill her. The victim was frightened and afraid; she cried and could not scream. She got out of her car and started to walk toward the rear of her car and the appellant told her "not to try to get away" and said he would kill her if she tried to leave. The victim had left her purse in her car and started back to the front seat of her automobile to secure her purse. Appellant grabbed her by the arm and asked where and why she was going and the victim answered to the effect that she was going to get her purse which had some money in it. The victim got into appellant's automobile and he then drove several blocks into a residential district of Long Beach and parked the car at the curb. Appellant then pulled at the wearing apparel of the victim. The victim was crying and stated to appellant that she was not going to fight him because she was very much afraid. The appellant then committed an act of sexual intercourse with the victim. Appellant thereafter started his automobile and drove in the general direction of where the victim's car was parked. He took her purse and went through the items therein and by his questions put to the victim indicated to her that he was a policeman.

Appellant asked, among other things, if the victim used narcotics and she answered in the negative and appellant said, "Well, we know that you have been. We have been onto you for a long"—long time and took her arm and looked at it, apparently for needle marks. The appellant told the victim that his name was Jack Cooper and when asked if he was a police officer the appellant neither denied it nor said that he was such and told the victim to "shut up" and at the same time reached with his right hand into the left side of his jacket. The appellant drove his automobile near to where the victim's car was parked and stopped. The victim was told by appellant that a "blond fellow" was going to use the same approach or do the same thing to her. He then, upon the victim's request, returned the victim's keys and purse to her and she thereupon got out of the car. As she did so the appellant said he wanted to pay her and threw a lighted cigarette out of his car onto the ground and reached into his pocket and then threw a "crumpled piece of paper or a bill onto the park grass" and told the victim to pick it up. She demurred to picking up the paper and the appellant again said, "Pick it up" and the victim picked up the cigarette instead, walked behind the appellant's car and threw down the cigarette. While behind appellant's car she secured the make and number of appellant's automobile. In answer to a question by the victim the appellant stated in effect that he had picked her up because she had come from the bar alone.

By this time in the course of events it was about 2:30 a.m. and the bar was closed. The victim got into her car and drove a few blocks to a bar named the Rose Room where the victim knew the owner, waitress and bartender. At the Rose Room at the hour of about 2:30 a.m. on July 26, 1959, the victim was in a hysterical condition and kept asking someone to write down the number of appellant's car and told the bartender and three other persons who were there that she had been raped. The victim then went to her home in Seal Beach and told her husband what had occurred. The police were called and the victim talked to them.

Officer Morrill of the Long Beach Police visited appellant's house on July 30, 1959, and was told by appellant's wife who was known to the police that the appellant was not at home. The officer did not tell the appellant's wife that he wanted to talk to him about the rape which had occurred on July 26th, but stated that he wanted to see appellant about some thefts from some mail boxes. Appellant appeared at the police station

about 4 a.m. July 31, 1959. When asked where he had been on the night of July 25th and early morning of July 26th, appellant stated that he had been home from 11 p.m. that night until late the following day.

Later, on July 31st, Officer Morrill again talked to appellant and appellant was told that a woman had been raped on the morning of July 26th and that the license number of his car had been obtained. Appellant stated that he could prove where he had been at 11 p.m. Saturday night and the officer told appellant that he had not mentioned 11. The officer then asked appellant where he had been on the night and early morning of July 25th and 26th. Appellant stated that he had no idea about where he had been; that he paid no attention to the time; that he could not obtain a fair trial in the city; that he wanted to defend himself and then said, "That woman hadn't been hurt, had she?" Appellant then said that he "was a lot smarter this time than he was before, [and] that he had been studying a lot of rape cases."

On August 3, 1959, Officer Morrill had another talk with the appellant in the presence of the lieutenant in charge of the jail and the appellant said that Morrill had in effect framed him by showing his picture to the victim and then finding the number of the appellant's automobile and advising her of such number. Officer Morrill then asked appellant "if he could give—the name of any person that he knew in this town or in San Quentin who had been convicted of"—"If he could give me the name of any person who had been convicted of a crime that he didn't commit," and the appellant answered that he could not. The officer then asked appellant, "if he knew of anyone who had been tried for an offense and acquitted at a trial—even though that person had in fact committed the offense." The appellant laughed and said, "Yes, me." The officer started to testify as to what the appellant had then told him concerning an offense for which he (appellant) was tried in 1957 and an objection thereto was sustained and the court directed the jury to disregard any reference to any statement about the state prison. The prosecution introduced the testimony of a lady who was allegedly involved in an episode with the appellant in 1957. She stated that she met the appellant in the afternoon of a day in September 1957 when he had come to look at some property on Loma Vista Drive in Long Beach which she had for sale or lease. Appellant introduced himself on that occasion as Mr. Lindstrom, stating that he was a recently graduated pharmacist and was looking for a house

for his family. The appellant was shown through the house and left stating that he might call about the property. The lady resided with her husband in Los Altos.

Between 9 and 10 p.m. that night the husband of the lady received a telephone call from a man who said his name was Lindstrom and such person said that he and his brother, a doctor from San Diego, would meet Mrs. Wise at the property. The husband of the lady was sick at that time and could not go to the property on Loma Vista. The lady went to the property herself and there saw the appellant who said upon being questioned that his brother had gone to make a telephone call and would be back later. The appellant and the lady entered the house, the lights were turned on and the appellant, after looking through the house, asked about the heater in a back bedroom. While in that area of the house the appellant grabbed the lady, she struggled and opened her mouth to scream and appellant put his hands over her mouth and dragged her into the bedroom and then reached inside of his coat while he still had her mouth covered and said, "When I let go of you, if you make one sound I'll cut you up." The lady was frightened and was afraid that she was going to be killed. She quit struggling, appellant released her and then struck her with his fists saying, "That's just to show you that I mean what I'm saying." The appellant stated in effect that he would give the lady $100, apparently in payment for an act of sexual intercourse. The lady told appellant to let her leave the house alive; that she was a mother and had to get home and not to harm her, that she would do whatever he wanted. Appellant removed a part of the undergarments of the lady and committed an act of sexual intercourse with her. After the act of intercourse had been committed appellant inquired of the lady about her purse and said he wanted to put the money in the purse. Appellant then told the lady, "Don't you move at all, you stay there." He then left the house.

After appellant's car drove away the lady left the house, got into her car and drove to a telephone booth where she called her husband and told him what had happened. It was stipulated at the trial of the present case that appellant had acted as his own attorney in the previous case and had been acquitted.

Appellant admitted on cross-examination that he had driven past the "Nineteenth Hole" about 11 p.m. Saturday, July 25th, on his way home from work but denied stopping his car and talking to the victim.

Appellant now contends that (1) it was error under the circumstances for the court to admit the testimony with reference to the former rape and (2) it was error for the officer to give improper testimony.

We will consider first the appellant's contention with reference to the evidence which was given concerning the 1957 offense. ██ It is the general rule that in a prosecution for a sex offense evidence of similar acts committed against other persons not named in the information are inadmissible. However, where the evidence of another sex offense is relevant and the testimony with reference thereto would have a tendency to prove or disprove a fact in issue, or to meet some evidence offered by the accused as a defense, it would be admissible. ██ As stated in *People* v. *Peete*, 28 Cal.2d 306, 314-315 [169 P.2d 924]:

". . . It is settled in this state, however, that except when it shows merely criminal disposition [citations], evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged. ██ 'The general tests of the admissibility of evidence in a criminal case are: . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' [Citations.] 'It is true that in trying a person charged with one offense it is ordinarily inadmissible to offer proof of another and distinct offense, but this is only because the proof of a distinct offense has ordinarily no tendency to establish the offense charged. But whenever the case is such that proof of one crime tends to prove any fact material in the trial of another, such proof is admissible, and the fact that it may tend to prejudice the defendant in the minds of the jurors is no ground for its exclusion.' " (See also *People* v. *Woods*, 35 Cal.2d 504, 509 [218 P.2d 981]; *People* v. *McCaughan*, 49 Cal.2d 409, 421-422 [317 P.2d 974].)

██ In this case it is to be noted that the parties conferred in the judge's chambers before the opening statements to the jury were made and the judge stated after the presentation of what the prosecution expected to establish that he would admit the evidence with reference to the prior alleged rape. Appellant made no objection when the prosecution spoke of the matter in their opening statement. There is no complaint

about the instructions which were given by the court with reference to such evidence. We think that the evidence of the lady involved in the 1957 episode was such that it tended to prove a material fact in the prosecution's case. The evidence showed, among other things, a peculiar or characteristic behavior pattern of the defendant which was manifested in the conduct of the transgressor in both crimes. (*People* v. *Cavanaugh,* 44 Cal.2d 252, 265-266 [282 P.2d 53] ; *People* v. *Cassandras,* 83 Cal.App.2d 272, 279-282 [188 P.2d 546].)

The judge very properly refused the prosecuting attorney the right to cross-examine the appellant about the prior raping inasmuch as the matter was not gone into on his direct examination. It is true that appellant could have attempted to explain away or to contradict what the lady said about the 1957 episode but apparently he saw fit not to do so. (*People* v. *Zerillo,* 36 Cal.2d 222 [223 P.2d 223].)

Some of the obvious similarities between the two offenses are as follows : In each case the woman was offered a large sum of money by appellant before she was attacked; in each case appellant gave an assumed name; in each case appellant threatened to do bodily harm or to kill the woman if she resisted; in each case the appellant sought to make it appear that he had a weapon which he would use by reaching into the inside of his coat with his hand; in each case appellant struck the woman with his fist; in each case only the undergarments were removed by the appellant, and in each case appellant stated or indicated that he wanted to pay the woman after he had committed the act of intercourse. (See *People* v. *Sullivan,* 96 Cal. App.2d 742, 744-748 [216 P.2d 558].)

The fact that appellant was acquitted in the 1957 trial is of no assistance to him insofar as the admissibility of the evidence is concerned. (*People* v. *Fox,* 126 Cal.App.2d 560, 569 [272 P.2d 832] ; and cases there cited.)

A reading of the entire record demonstrates that the trial judge considered the whole matter very carefully and apparently came to the conclusion that clearly the evidence of the 1957 raping was admissible in this particular case. We do not believe that the judge abused his discretion.

Considering the appellant's last contention with reference to the testimony of Officer Morrill, the officer testified to conversations he had had with the appellant, as heretofore set forth in the résumé of the facts, wherein he quoted the appellant as saying that, ''he was a lot smarter this time than he was before, that he had been studying a lot of rape cases.''

In their next talk the appellant had told the jailer of how Morrill was trying to frame him by providing pictures for the victim and in effect telling her what the appellant's car number was. In response to that statement Morrill asked appellant in effect if he knew of any innocent person ever being convicted and being in San Quentin and appellant answered in the negative and then Morrill asked appellant if he knew of anyone who had been tried and acquitted even though such person was in fact guilty of the offense and the appellant answered, "Yes, me." The transcript shows that as the officer started to explain that the offense which appellant was referring to was the 1957 episode, counsel for the appellant objected and the judge sustained the objection and admonished the jury to disregard the statement of the officer with reference to the state prison. The deputy district attorney asked no further questions along that line; however, on cross-examination counsel for appellant reopened the matter by asking the officer whether appellant had not told him that he had not raped the lady in question.

We think that there was no prejudicial error in the trial of the case.

The order denying the motion for a new trial and the judgment are and each is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied January 13, 1961, and appellant's petition for a hearing by the Supreme Court was denied February 15, 1961. Peters, J., was of the opinion that the petition should be granted.